IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| SAWNYA J. WILLIAMS,<br><br>        Plaintiff and Counter-<br>        Defendant,<br><br>    vs.<br><br>H & H AUTO PARTS, LLC,<br><br>        Defendant and Counter-<br>        Claimant. | **8:18-CV-137**<br><br>**MEMORANDUM AND ORDER** |

## I.     INTRODUCTION

This is an employment-discrimination case with counterclaims for breach of contract and defamation. It comes before the Court on Defendant's Motion for Summary Judgment as to all of Plaintiff's claims (Filing 90); Plaintiff's Motion for Summary Judgment as to both of Defendant's counterclaims (Filing 93); and Plaintiff's Motion to Strike and/or Leave to Surreply (Filing 103). For the reasons stated herein, the Court grants Defendant's Motion for Summary Judgment in part; grants Plaintiff's Motion for Summary Judgment on Defendant's counterclaims; and denies Plaintiff's Motion to Strike and/or Leave to Surreply.

## II.     BACKGROUND

Plaintiff, Sawnya Williams,[1] began working for Defendant, H&H Auto Parts, LLC (H&H), on January 7, 2016. Filing 98-1 at 2. H&H is located in Cozad, Nebraska, and sells salvage auto parts. Filing 92-1 at 1. Williams is female and at the time she applied to and was hired by H&H, she was forty years old. Filing 92-31 at 9; *see generally* Filing 98-1. Initially, Williams applied for

---

[1] Following the commencement of this lawsuit, Plaintiff married and changed her surname to Newburn. Filing 92-31 at 4-5. However, the parties continue to refer to her as "Williams" throughout the litigation. For the sake of clarity, the Court will do the same.

a salesperson/customer service job at H&H. Filing 92-31 at 97; Filing 98-3 at 1. After receiving her application, however, Autym Kosiski, the daughter of H&H's co-owners Zane and Joscelyn Malcom, contacted Williams to ask if she would be interested in applying for a commodities-broker position instead. Filing 92-31 at 36; Filing 92-23 at 2. Williams agreed to an interview for the commodities-broker job. Filing 92-31 at 36.

During her interview, Williams claims Zane told her she was "too old" for a sales position and "that he needed a young male to do that position" and that was why he wanted her in the commodities-broker role instead. Filing 92-31 at 175. Zane denied making any comment on Williams's age or gender or stating that age or gender was a job requirement for any position at H&H. Filing 92-1 at 3. Kosiski participated in the interview and also denied that Zane had made any age- or gender-related statements. Filing 92-23 at 2. After the interview, Williams accepted the commodities-broker job. Filing 92-1 at 3; Filing 92-31 at 37. She started at an initial pay rate of $17 per hour. Filing 92-1 at 3. Zane and Plaintiff discussed the possibility of her moving to commission-based pay in the future. Filing 92-1 at 3-4.

The commodities-broker job was a relatively new aspect of H&H's business. Filing 92-1 at 1-2. It began when H&H partnered with Cunningham Brothers, a Virginia-based company, starting in 2014 to domestically recapture auto-parts commodities business for original equipment manufacturers which would otherwise go overseas. Filing 92-1 at 2. As commodities broker, Williams received a list of parts that H&H was trying to procure for its partner companies. Filing 92-31 at 23. Williams would look for the requested parts and try to purchase them at the lowest possible price so H&H could resell them for a profit. Filing 92-31 at 23-24. In contrast to a sales position, Williams filled existing purchase orders for resale rather than making new sales. Filing 92-1 at 7. Williams was supervised by Zane, while the sales staff reported to the sales manager.

Filing 98-1 at 2. Williams had weekly meetings with Zane and Cunningham Brothers staff while the sales staff had a separate weekly meeting in which Williams did not participate. Filing 98-1 at 6; Filing 98-7 at 2. Williams agrees that there was no one "else at H & H who was responsible for doing those broker duties of trying to buy the parts." Filing 92-31 at 29.

Prior to Williams being hired as commodities broker, the position had been held part-time by Kosiski and then full-time by Tiffany Thurn. Filing 92-1 at 2. Kosiski worked part-time as commodities broker and was paid at the rate of $15.50 per hour. Filing 92-1 at 2; 92-7 at 2. Thurn worked in the role for approximately six months beginning in August 2015 and was initially paid $13 per hour before receiving a raise to $14 per hour. Filing 92-7 at 2. Both Kosiski and Thurn are female and were under the age of forty when they worked in the commodities-broker role at H&H. Filing 92-7 at 2.

Outside of H&H, a Cunningham Brothers employee named Stephanie Williams[2] performed similar job duties to Williams. Filing 92-31 at 24-25. Stephanie Williams was located in Virginia and worked closely with Williams on the phone. Filing 92-31 at 25. Stephanie Williams and Williams would both act as brokers to buy parts to fulfill existing orders and would contact parts-suppliers in separate regions of the country. Filing 92-31 at 25; Filing 92-25 at 1-2. H&H had no part in paying Stephanie Williams or setting her pay rate. Filing 92-25 at 1-2.

In contrast to how Williams was paid in the commodities-broker role, salespeople at H&H were generally paid on a commission basis after an initial salaried probationary period. Filing 92-1 at 3. Ryan Rahmann, a male under 40 years of age, was hired in sales in September 2014 at an hourly rate of $15. Filing 92-7 at 2; Filing 92-14 at 1. After six months, Rahmann moved to commission-based pay. Filing 92-7 at 2-3. Thomas Ramirez, a male under the age of 40, was hired

---

[2] Stephanie Williams is not related to Sawnya Williams.

as a salesperson in August 2016 at an hourly rate of $14. Filing 92-7 at 3. John Wilcox, another salesperson, was hired in 2012 and was paid based on commissions by the time Williams started at H&H. Filing 92-7 at 2. Zach Horse was the sales manager. Filing 92-24 at 1; Filing 92-31 at 21. When he started at H&H in a sales role, he was paid between $11 and $12 an hour. Filing 98-21 at 12. Horse testified that sales representatives at H&H's Cozad location made between $40,000 and $60,000 annually. Filing 98-21 at 26.

On March 25, 2016, H&H had Williams sign a nondisclosure agreement. Filing 92-16. In relevant part, it provided:

> The Employee shall not disclose to any person, firm, or corporation any trade, technical or technological secrets, any details of organizations or business affairs, any names of past or present customers of the Company or its affiliates or any other information relating to the business or businesses or their affiliates.

Filing 98-19 at 55.

During her first two weeks of employment, Williams worked 3.4 hours of overtime for which she was not compensated. Filing 92-31 at 71. Williams claims she discussed the non-payment of her overtime hours with Joscelyn who refused to pay her. Filing 92-31 at 72. Williams was eventually paid for the missed overtime wages in January 2017, nearly one year later, after making a complaint to HR. Filing 92-31 at 74.

After three months of employment, H&H provided Williams with a performance review. Filing 98-19 at 54. H&H ranked Williams at a five out of five ("Exceeds Expectations Always") in nine out of eleven categories. Filing 98-19 at 64. In the remaining two categories (efficiency and performance above and beyond her routine duties) Williams scored a four out of five. Filing 98-19 at 64. Following the positive three-month performance review, H&H gave Williams a raise to $19 per hour. Filing 92-31 at 38; Filing 92-7 at 2.

As 2016 progressed, however, the parties dispute the quality of Williams's work. Starting in November 2016, Williams was assigned part-time online sales work. Filing 92-31 at 18-19. Williams contends she was given the sales work because she was doing so well with the commodities program and H&H needed her additional help in sales. Filing 92-31 at 19-20. H&H, in turn, contends that Williams was given the opportunity to do online sales work in order to compensate for her poor performance and lack of effort as commodities broker. Filing 92-1 at 5.

The working relationship between Williams and H&H continued to deteriorate as 2016 neared its end. The parties agree that on December 21, 2016, Williams sent an email to H&H's outside human resources consultant, Doug Pedersen, listing several complaints against the company. Filing 92-1 at 8; Filing 98-10 at 1-2; Filing 92-27 at 2. At the time, the Malcoms were out of town. Filing 92-1 at 8. Williams's email stated she was "unhappy about a few things" and had "tried to let things pass and hope they would improve, however, they have not." Filing 98-10 at 1. Williams stated that she had originally applied for a sales position advertised at $50,000 salary plus commission but was told at the interview she was "too old" and offered the commodities-broker role instead. Filing 98-10 at 1. She claimed she had not been paid for approved overtime, had been criticized by Joscelyn who told her she was "overweight" for needing time off for medical reasons, and was not allowed alone in Zane's office because it made Joscelyn "too uncomfortable." Filing 98-10 at 2. Williams also complained about her pay, stating she was not yet being paid on a commission basis and only received a $300 annual bonus. Filing 98-10 at 2. Lastly, Williams stated she had spoken with other employees who were also dissatisfied with their pay arrangements. Filing 98-10 at 2.

On December 27, 2016, Williams sent a follow-up email to Pedersen. Filing 98-10 at 9-10. In it, she complained about inconsistencies in H&H's employee handbook and aspects of the policy

that she thought H&H was not following. Filing 98-10 at 9-10. For example, Williams pointed out the handbook stated that part-time employees are those working thirty hours or less, but she was told if her hours dropped below thirty-eight per week, she would not eligible for certain full-time benefits. Filing 98-10 at 10. Finally, in an email dated December 29, Williams complained about being excluded from a pizza party celebrating the company's high sales numbers. Filing 98-10 at 5.

Pedersen first informed Zane and Joscelyn about Williams's complaints in an email dated December 28, 2016. Filing 98-13 at 2. He suggested he meet with the Malcoms upon their return to work and advised, "Don't say anything out of the ordinary [to Williams]. It's best we talk about the alleged issues first then deal with her as necessary." Filing 98-13 at 1. On January 4, 2017, Pedersen sent another email informing the Malcoms he had spoken with Williams by phone and would be sending a follow-up email to her. Filing 98-14 at 4. Zane responded on January 5, "Thanks, I need to know how to get rid of her legally, she will be a problem!!" Filing 98-14 at 4. Pedersen responded that Zane and Joscelyn should "use her [upcoming one-year] performance review" to "focus on her weakness." Filing 98-14 at 3. He advised the Malcoms to also focus on areas where Williams had done well, but to "not give her an increase in pay." Filing 98-14 at 3. He reasoned, "If we do terminate her in the very near future, we don't want to have to justify why we gave a person a raise then terminated them." Filing 98-14 at 3. Zane responded:

> Yes, ill [sic] get a eval done with expectations and discipline criteria, I feel we should give a written warning at time of eval on (not sure how to say it but stirring the pot with other employees), [if] management hears [o]f this again she will lose her job? Also he[r] hours probably are not that great over the last 6 months, I will get from Joscelyn.

Filing 98-14 at 3.

Later in the afternoon on January 5, 2017, Zane received an email from Stephanie Williams's supervisor at Cunningham Brothers informing him that Williams had posted on Facebook regarding her employment in a way that Stephanie Williams reported as inappropriate.[3] Filing 92-1 at 9; Filing 92-25 at 3. The Facebook post was dated December 10, 2016, and stated:

> Ok. . I'm either really screwed up, selfish, or I'm justified. Trying to figure out which. I worked in sales in St. Joe . . . learned quite a bit from some friends at a training I attended. I'm now back in sales . . . and I said when I was hired, I refused to get screwed again. Well . . . I've been screwed, but I thought surely to GOD they will make it right with the Christmas bonus I heard we get . . . my profit for the year . . 250k. I'm not on commission now (aka . . getting screwed) . . . my bonus . . . 300. I feel sick. Am I wrong . . tell me I'm greedy and wrong . . . I don't have vacation or sick leave . . not yet . . and every time I've taken it, unpaid of course, I've been "asked" if I needed to go part time? I make $19 an hour, but the job I applied for was $50k a year. . I was too "old" for that . . I'm sick.

Filing 98-9 at 1 (ellipses in original).

Regarding the Facebook post, Zane sent an email to Pedersen stating, "I am getting a[n] email of Sawnya [Williams] posting her Christmas bonus, a pay stub, and what she thinks she made in profit out of a YMS report. She posted on Face Book [sic]. She need [sic] fired!!" Filing 98-14 at 3. Pedersen replied that "[t]echnically, what is put on social media by an employee is a gray area." Filing 98-14 at 1. He advised Zane could fire her for attempting to "disrupt the work place" and posting confidential informational. Filing 98-14 at 1-2. Pedersen recommended Zane hold a meeting with Williams and inform her she was being terminated because "she is violating company policies and her continual disruption can no longer be allowed." Filing 98-14 at 2. Pedersen advised Zane "[t]his is the language that we will use when she files for unemployment or other action." Filing 98-14 at 2. He warned him, "You must be specific so she does not take

---

[3] H&H alleges there were previous "concerning" Facebook posts from Williams. Filing 92-1 at 8; Filing 92-25 at 3. Williams denies any previous posts related to her employment at H&H. Filing 97 at 12-13. In any case, the content of the alleged prior posts are not in the record and the parties only point to and discuss the December 2016 post as having relevance to the present litigation. Accordingly, the Court determines the disputed existence of any prior Facebook posts is not a material fact which would preclude summary judgment.

your terminating her as retaliation. This is very key." [Filing 98-14 at 2](Filing 98-14 at 2). Zane responded, "SHE HAS SIGNED A NDA ALSO?" [Filing 98-14 at 1](Filing 98-14 at 1). Pedersen agreed this was "[m]ore reasons to have the meeting" but warned Zane to "base your decision on her behavior and disruption in the workplace [because y]ou don't want this to turn into a retaliatory type of decision." [Filing 98-14 at 1](Filing 98-14 at 1).

H&H fired Williams on January 9, 2017. [Filing 92-1 at 10](Filing 92-1 at 10). According to Williams, Zane told her she was being terminated for the Facebook post and for making complaints and "telling the H.R. guy 'nothing but lies.'" [Filing 92-31 at 161](Filing 92-31 at 161); [Filing 98-1 at 7](Filing 98-1 at 7). Williams reiterated to Zane that during her interview he had referenced her being too old for the sales position. [Filing 98-1 at 7](Filing 98-1 at 7). According to Williams, Zane agreed, stating "I told you [at your interview] that you were too old and didn't fit the profile of the young men I wanted out there." [Filing 98-1 at 7](Filing 98-1 at 7). Williams told Zane that she could back up everything she had said in her email to Pedersen, including that she was denied overtime pay, that Zane told her she was "too old" for the sales position, and that Joscelyn told her she was "fat" and "overweight." [Filing 98-1 at 7](Filing 98-1 at 7). Zane denied making any statement about Williams's age or gender at her termination. [Filing 92-1 at 10](Filing 92-1 at 10). Zach Horse was present at the meeting and testified that he did not recall hearing Zane make any statement regarding Williams's age or gender, nor did he recall Williams accusing Zane of having made a comment on her age or gender. [Filing 92-24 at 3](Filing 92-24 at 3).

H&H provided a "Voluntary/Involuntary Employment Termination" form regarding Williams's employment. [Filing 98-19 at 54](Filing 98-19 at 54). The form stated Williams was being terminated effective January 9, 2017, due to "disruptive activities in the workplace." [Filing 98-19 at 54](Filing 98-19 at 54). The form was signed by Zane, sales manager Zach Horse as a witness, and Williams. [Filing 98-19 at 54](Filing 98-19 at 54). Next to her signature, Williams wrote, "I don't agree." [Filing 98-19 at 54](Filing 98-19 at 54).

The parties dispute the true motivation for Williams's firing. Williams contends the timing of her firing immediately after making complaints to HR show that the firing was retaliatory. Filing 97 at 15-17. Zane contends he only made the decision to fire Williams after seeing her Facebook post, stating "I decided it was in the company's best interest to terminate Plaintiff's employment in order to ensure that H&H's business was secure and that the company did not suffer because of one employee's decision to breach confidentiality." Filing 92-1 at 9. He claims, "If Plaintiff had not violated her NDA, her employment would not have been terminated . . . ." Filing 92-1 at 10.

After firing Williams, H&H received a notice from the Nebraska Department of Labor regarding whether it had provided Williams with notice of her right to continue insurance coverage pursuant to the Consolidated Omnibus Budget Reconciliation Act (COBRA). Filing 92-7 at 5. Joscelyn, H&H's plan administrator, testified she was not aware that H&H was subject to COBRA because the company's insurance agent had said it was not. Filing 92-7 at 6. After receiving the Department of Labor notice, Joscelyn determined H&H was, in fact, subject to COBRA. H&H sent Williams a letter regarding her right to continue her health care coverage pursuant to COBRA dated April 17, 2017. Filing 98-17 at 3. Williams did not elect to enroll in COBRA coverage. Filing 92-31 at 143. She testified that she obtained health insurance coverage from her new job in April 2017. Filing 92-31 at 143. From the time of her termination at H&H until she secured new health insurance, Williams did not incur any health expenses. Filing 92-31 at 146-47. She obtained free counseling sessions for mental health issues during the time she did not have health insurance. Filing 92-31 at 57, 143-44, 146.

Williams filed charges of discrimination against H&H with the U.S. Equal Employment Opportunity Commission and the Nebraska Equal Opportunity Commission on June 26, 2017. Filing 92-19. The EEOC dismissed her charge and issued Williams notice of her right to sue on

December 28, 2017. Filing 92-20 at 1. The NEOC likewise dismissed Williams's charge and notified her of her right to sue on January 19, 2018. Filing 92-21 at 1.

Williams filed suit in the present case on March 27, 2018, alleging state and federal gender discrimination, state and federal age discrimination, retaliation, violation of the Equal Pay Act, and violation of COBRA. Filing 1. H&H answered and filed counterclaims alleging Williams's Facebook post constituted a breach of her NDA and constituted defamation. Filing 6 at 8-12. H&H moved for summary judgment as to all of Williams's claims and as to the issue of liability on its counterclaim for breach of contract. Filing 90. Williams moved for summary judgment as to both of Defendant's counterclaims. Filing 93. Williams also filed a Motion to Strike and/or Leave to Surreply, arguing H&H had raised new issues in its summary judgment reply brief. Filing 103.

### III.    STANDARD OF REVIEW

"Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Garrison v. ConAgra Foods Packaged Foods, LLC*, 833 F.3d 881, 884 (8th Cir. 2016) (citing Fed. R. Civ. P. 56(c). "[S]ummary judgment is not disfavored and is designed for every action." *Briscoe v. Cty. of St. Louis*, 690 F.3d 1004, 1011 n.2 (8th Cir. 2012) (internal quotation marks omitted) (quoting *Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc)). In reviewing a motion for summary judgment, the Court will view "the record in the light most favorable to the nonmoving party . . . drawing all reasonable inferences in that party's favor." *Whitney v. Guys, Inc.*, 826 F.3d 1074, 1076 (8th Cir. 2016) (citing *Hitt v. Harsco Corp.*, 356 F.3d 920, 923–24 (8th Cir. 2004)). Where the nonmoving party will bear the burden of proof at trial on a dispositive issue, "Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), *except* the

mere pleadings themselves." *Se. Mo. Hosp. v. C.R. Bard, Inc.*, 642 F.3d 608, 618 (8th Cir. 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). The moving party need not produce evidence showing "an absence of a genuine issue of material fact." *Johnson v. Wheeling Mach. Prods.*, 779 F.3d 514, 517 (8th Cir. 2015) (quoting *Celotex*, 477 U.S. at 325). Instead, "the burden on the moving party may be discharged by 'showing' . . . that there is an absence of evidence to support the nonmoving party's case." *St. Jude Med., Inc. v. Lifecare Int'l, Inc.*, 250 F.3d 587, 596 (8th Cir. 2001) (quoting *Celotex*, 477 U.S. at 325).

In response to the moving party's showing, the nonmoving party's burden is to produce "specific facts sufficient to raise a genuine issue for trial." *Haggenmiller v. ABM Parking Servs., Inc.*, 837 F.3d 879, 884 (8th Cir. 2016) (quoting *Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 853 (8th Cir. 2012)). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial." *Wagner v. Gallup, Inc.*, 788 F.3d 877, 882 (8th Cir. 2015) (quoting *Torgerson*, 643 F.3d at 1042). "[T]here must be more than 'the mere existence of *some* alleged factual dispute'" between the parties in order to overcome summary judgment. *Dick v. Dickinson State Univ.*, 826 F.3d 1054, 1061 (8th Cir. 2016) (quoting *Vacca v. Viacom Broad. of Mo., Inc.*, 875 F.2d 1337, 1339 (8th Cir. 1989)).

## IV.    DISCUSSION

Williams alleges claims of state and federal gender discrimination, state and federal age discrimination, state and federal retaliation based on her firing, violation of the Equal Pay Act, and violation of COBRA. *See generally* Filing 1. In its counterclaim, H&H alleges Williams breached the nondisclosure agreement and that Williams's Facebook post constituted defamation. Filing 6 at 8-12. H&H has moved for summary judgment as to all of Williams's claims while Williams has

moved for summary judgment as to each of H&H's counterclaims. The Court will address each of these contentions in turn.

## A.  Gender-Based Wage Discrimination and Equal Pay Act

Williams alleges in Count VII of her Complaint that she was paid less than the males employed at H&H and that this constitutes a violation of the Equal Pay Act (EPA), 29 U.S.C. § 206(d)(1). Filing 1 at 8-9. Additionally, as part of her gender-discrimination claim in Count I, Williams alleges she was paid an unequal wage based on being a woman, as prohibited by Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e et seq. Filing 1 at 5-6. The Eighth Circuit has held that the same standard applies to both claims, and accordingly the Court will address them together. *See Sowell v. Alumina Ceramics, Inc.*, 251 F.3d 678, 683 (8th Cir. 2001) (citing *EEOC v. Delight Wholesale Co.*, 973 F.2d 664, 669 (8th Cir. 1992)) (holding same standard applies to Equal Pay Act and Title VII wage-discrimination claims).

"A successful gender-based wage discrimination claim under Title VII requires the plaintiff to prove that her employer pays different wages to employees of opposite sexes 'for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'" *Id.* (quoting *Corning Glass Works v. Brennan*, 417 U.S. 188, 195, 94 S. Ct. 2223, 41 L. Ed. 2d 1 (1974)). Similarly, the EPA prohibits pay discrimination on the basis of sex. 29 U.S.C. § 206(d). "A plaintiff must first establish a prima facie case that women were paid less than men in the same establishment for equal work requiring equal skill, effort, and responsibility and performed under similar working conditions." *Price v. N. States Power Co.*, 664 F.3d 1186, 1191 (8th Cir. 2011) (citing *Hutchins v. Int'l Bhd. of Teamsters*, 177 F.3d 1076, 1080 (8th Cir. 1999)); *see also* 29 U.S.C. § 206(d)(1) (prohibiting unequal wages

based on gender "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions").

"If a plaintiff establishes a prima facie case, the burden then shifts to the defendant to prove one of four statutory affirmative defenses." *Id.* (citing *Hutchins*, 177 F.3d at 1081). "Those defenses require an employer to prove that any wage differential is explained by '(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex.'" *Id.* (quoting 29 U.S.C. § 206(d)(1)).

Construing the facts in the light most favorable to Williams, she cannot establish a prima facie case for a either a Title VII wage-discrimination claim or an EPA violation because she has not shown that any males worked in an equivalent role to her commodities-broker position at H&H. Thus, she cannot establish an inference of discrimination. "Whether different employees are performing equal work does not necessarily depend on job titles, but rather on the actual requirements of the job." *Bearden v. Int'l Paper Co.*, 529 F.3d 828, 833 (8th Cir. 2008) (citing *Holland v. Sam's Club*, 487 F.3d 641, 645 (8th Cir. 2007)).

The undisputed facts show that Williams's role as commodities broker was dissimilar from that of a salesperson. Williams filled existing purchase orders and was responsible for looking for the requested parts to purchase at the lowest possible cost. Filing 92-31 at 23. In contrast, salespersons at H&H were responsible for making sales, not procuring items. Filing 92-1 at 7. Williams was overseen by a different supervisor than the salespeople and participated in different weekly meetings. Filing 98-1 at 2,6; Filing 98-7 at 2. Furthermore, even when Williams did begin to perform some sales work part-time starting in November 2016, Filing 92-31 at 18-19, this was only a portion of her duties and her overall role still involved substantial commodities work, unlike

any of the full-time salespeople. *See* Filing 92-31 at 29 (Williams agrees that there was no one "else at H & H who was responsible for . . . broker duties."). Accordingly, because Williams cannot demonstrate that any males worked in a job "requiring equal skill, effort, and responsibility and performed under similar working conditions," *Price*, 664 F.3d at 1191, she cannot establish a prima facie claim for violation of the EPA or gender-based wage discrimination.

### B. Gender Discrimination

Williams also asserts claims under Title VII, 42 U.S.C. § 2000e-2, and the Nebraska Fair Employment Practices Act (NFEPA), Neb. Rev. Stat. § 48-1104 (Reissue 2010), for discrimination based on her gender at Counts I (Title VII) and II (NFEPA). Filing 1 at 5-6.

"Title VII prohibits discrimination in employment on the basis of gender." *Fiero v. CSG Sys., Inc.*, 759 F.3d 874, 878 (8th Cir. 2014) (citing *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 993 (8th Cir. 2011)). Title VII provides:

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . .

42 U.S.C. § 2000e-2. Neb. Rev. Stat. § 48-1104 is nearly identically worded.

In the absence of direct evidence of gender-based discrimination, a court analyzing a Title VII or NFEPA gender-discrimination claim employs the *McDonnell Douglas* burden-shifting framework. *See Fiero*, 759 F.3d at 878; *Father Flanagan's Boys' Home v. Agnew*, 256 Neb. 394, 401, 590 N.W.2d 688, 693 (1999) ("This court has adopted [the *McDonnell Douglas*] test for purposes of construing the NFEPA."). "Under that framework, [the] 'plaintiff must first present a prima facie case of intentional discrimination. The burden then shifts to [the] defendant to articulate a legitimate, nondiscriminatory reason for its action. If defendant meets that minimal

burden, plaintiff must show that the proffered nondiscriminatory reason is merely a pretext for unlawful . . . discrimination." *Fiero*, 759 F.3d at 878 (quoting *Putman v. Unity Health Sys.*, 348 F.3d 732, 735 (8th Cir.2003)). To establish a prima facie case of gender discrimination, Williams must demonstrate that: "(1) she was a member of a protected class; (2) she was qualified for her job; (3) she suffered an adverse employment action; and (4) there are facts that give rise to an inference of unlawful gender discrimination." *Id.* (quoting *Wells v. SCI Mgmt., L.P.*, 469 F.3d 697, 700 (8th Cir. 2006)). Here, neither party argues there is direct evidence of gender discrimination and so the Court proceeds to the burden-shifting analysis.

Williams alleges she suffered gender discrimination in the form of "harassment, unequal pay, and termination of her employment." Filing 1 at 6. The Court has already addressed Williams's gender-based claim of unequal pay and found Williams has not established she was paid unequally on the basis of sex. With respect to Williams's claim of gender-based "harassment," Williams has not established a prima facie case that she did, in fact, suffer harassment, let alone that the harassment was an adverse employment action or that it gives rise to an inference of unlawful discrimination. Williams claimed that Joscelyn called her "overweight" in relation to her request for time off for a medical condition and that she was not allowed in Zane's office because it made Joscelyn "uncomfortable," but there is no evidence to suggest this was related to or motivated by Williams's gender. Filing 98-10 at 2. Additionally, Williams conceded in her deposition that these complaints did not amount to "harassment." Filing 92-31 at 47. The Court finds no other incidents in the record which would constitute gender-based harassment.

Lastly, Williams alleges she suffered gender discrimination when H&H fired her. The Court finds there is no evidence that gender played any role in Williams's firing. Williams claims Zane referenced his need for a young man in the sales role when he hired Williams and that she

brought this comment up again at her firing. Filing 98-1 at 7. Zane disputes referencing Williams's gender on either occasion. However, this disputed fact is not material as Williams does not assert a claim of discrimination in her *hiring* but only in relation to her termination. Neither party presents evidence Williams's gender was referenced or used in any way in relation to her firing. Zane's alleged single remark nearly a year earlier which he made to explain his hiring decision, not his firing decision, does not constitute gender discrimination.

Furthermore, even if Williams could establish a prima facie case of gender discrimination, H&H has articulated a legitimate, nondiscriminatory reason for its actions, which Williams has not shown is pretextual. Specifically, H&H has presented evidence that Williams was treated differently from the male salespeople because of differences between her role as commodities broker and those of a salesperson, not based on gender. Williams has not presented any evidence to refute this. With respect to Williams's firing, H&H alleges it was due to her increasingly poor performance, her disruptive behavior in the workplace, and her breach of the NDA by posting confidential information on Facebook.[4] Accordingly, Williams's claims of gender discrimination under Title VII and the NFEPA fail.

## C. Age Discrimination

Williams next claims that she was subject to discrimination on the basis of age under both the federal Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 et seq., in Count III of her Complaint and the Nebraska Age Discrimination in Employment Act (NADEA), Neb. Rev. Stat. § 48-1001 et seq., in Count IV. Filing 1 at 6-7.

---

[4] Below, the Court determines that a dispute of material fact precludes it from granting summary judgment on Williams's state retaliatory-firing claim. This ruling does not affect the Court's determination that Williams cannot refute H&H's proffered reasons for terminating her in relation to her gender-discrimination claim. The standard for a gender-discrimination claim is whether Williams can show the proffered reasons are "merely a pretext *for unlawful . . . discrimination.*" *Fiero*, 759 F.3d at 878 (emphasis supplied). While a question remains as to whether Williams can prove H&H's reasons for firing her were a mere pretext for retaliation, Williams has not presented any evidence to show they were a pretext for gender discrimination.

The ADEA restricts employers from discriminating against employees who are 40 years of age or older with respect to their "compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). The NADEA similarly makes it unlawful for an employer to discharge or discriminate against any individual because of such individual's age, unless the reasonable demands of the position require an age distinction. Neb. Rev. Stat. § 48-1004(1). The NADEA is patterned after the ADEA, thus it is appropriate to look to federal decisions interpreting the federal act when construing the NADEA. *Oldfield v. Nebraska Mach. Co.*, 296 Neb. 469, 487, 894 N.W.2d 278, 292 (2017).

Like Williams's gender-discrimination claim above, a plaintiff alleging age discrimination can present either direct evidence of discrimination or circumstantial evidence which triggers the *McDonnell Douglas* burden-shifting analysis. *Aulick v. Skybridge Americas, Inc.*, 860 F.3d 613, 620 (8th Cir. 2017). Under *McDonnell Douglas*, the plaintiff must establish a prima facie case of discrimination which requires the plaintiff to show she (1) was at least forty years old; (2) was qualified for the position in question; (3) suffered an adverse employment action; and (4) was rejected for or treated less favorably than someone sufficiently younger to permit the inference of age discrimination. *Id.* at 620-21; *Onyiah v. St. Cloud State Univ.*, 684 F.3d 711, 719 (8th Cir. 2012). If the plaintiff succeeds, the "employer must articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Aulick*, 860 F.3d at 621. If the employer meets this burden, then the plaintiff must prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. *Id.* at 620. Ultimately, age must have been the but-for cause of the employment decision for an ADEA claim. *Hilde v. City of Eveleth*, 777 F.3d 998, 1003 (8th Cir. 2015). For an NADEA claim, age must have

been a determining factor rather than the but-for cause. *Oldfield*, 296 Neb. at 487, 894 N.W.2d at 292.

H&H does not dispute that Williams was over forty years of age at all times relevant to her employment. She has also shown she was qualified for the commodities-broker role based on her being hired and her positive three-month review, which H&H does not dispute. Williams claims she suffered adverse employment actions in the form of being paid less than younger coworkers, being terminated for her age, and being replaced by an individual under the age of forty. Filing 1 at 6-7.

First, Williams has not shown that she was paid less than her younger coworkers. Numerous younger employees were paid less than Williams, including Autym Kosiski ($15.50 per hour) and Tiffany Thurn ($13 and subsequently $14 per hour) when they were performing Williams's same job, commodities broker, as were various salespeople. Filing 92-1 at 2; Filing 92-7 at 2; Filing 92-7 at 3; Filing 92-7 at 2; Filing 98-21 at 12; Filing 98-21 at 6. Furthermore, Williams received a raise from $17 to $19 an hour after three months. She therefore has not established a prima facie case that she was treated less favorably than younger employees such as would permit the inference of age discrimination in relation to her pay.

Second, there is no evidence that age played any role in Williams's firing. Williams claims Zane referenced his need for a young man in the sales role when he hired Williams and that she brought this up again at her firing. However, neither party alleges Zane referenced her age as a reason for her termination. As with her gender-discrimination claim, Zane's alleged single remark nearly a year earlier which he made to explain his hiring decision, not his firing decision, does not support an inference of age discrimination. Additionally, H&H has presented evidence that

Williams was not, in fact, replaced by a younger individual, but rather that her job duties were absorbed by existing staff members. [Filing 98-21 at 27](#).

Furthermore, even if Williams could establish a prima facie case of age discrimination, H&H has articulated a legitimate, nondiscriminatory reason for its actions, which Williams has not shown is pretextual. Specifically, H&H has presented evidence that Williams was treated differently from the salespeople because of differences between her role as commodities broker and those of a salesperson, not based on their ages. Williams has not presented any evidence to refute this. As stated above, H&H also alleges Williams's firing was due to her increasingly poor performance, her disruptive behavior in the workplace, and her breach of the NDA by posting confidential information on Facebook. Accordingly, Williams has failed to set forth a prima facie case of age discrimination under either the ADEA or the NADEA.

## D. Retaliation

Williams next alleges that she engaged in protected conduct by complaining about nonpayment of overtime, sex discrimination, and age discrimination. [Filing 1 at 7-8](#). She also claims that her Facebook post itself was protected conduct because "[t]he purpose and intent of the Facebook post was to oppose sex and age discrimination." [Filing 97 at 27](#). Williams claims H&H retaliated against her for engaging in this protected activity by "subjecting her to harassment and terminating her employment."[5] [Filing 1 at 8](#). Williams asserts this constitutes retaliation under Title VII in Count V and the NFEPA in Count VI of her Complaint.[6]

---

[5] As analyzed above, Williams has not presented any evidence that she suffered harassment. Accordingly, the Court will analyze her retaliation claim only in the context of her termination.

[6] Williams's Complaint places both her Title VII and NFEPA retaliation claims in a single section and it is thus unclear which is meant to be labeled as Count V and which as Count VI. [Filing 1 at 7-8](#). However, with her gender- and age-discrimination claims, Williams lists the federal allegation first and the state allegation second. The Court will assume Williams intended to follow the same pattern and thus treat her federal Title VII allegation as Count V and her state NFEPA allegation as Count VI.

Title VII prohibits retaliation against an employee "because [she] has opposed any practice made an unlawful employment practice by [Title VII], or because [she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e–3(a). Under Title VII, it is an unlawful employment practice for an employer:

> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
>
> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e–2(a). Age is not an enumerated category under Title VII. Thus, only Williams's claim of gender discrimination can support her Title VII retaliation claim.

NFEPA is broader and prohibits retaliating against an employee for engaging in protected activity such as opposition to "any practice or refus[al] to carry out any action unlawful under federal law or the laws of this state." *See* Neb. Rev. Stat. § 48-1114(1) (Supp. 2019). It provides in relevant part:

> (1) It shall be an unlawful employment practice for an employer to discriminate against any of his or her employees or applicants for employment . . . because he or she (a) has opposed any practice made an unlawful employment practice by the Nebraska Fair Employment Practice Act, . . . (c) has opposed any practice or refused to carry out any action unlawful under federal law or the laws of this state . . . .

Neb. Rev. Stat § 48-1114(1). Thus, Williams's claim of gender discrimination as well as her claims of age discrimination and nonpayment of overtime can support her NFEPA retaliation claim.

Under the applicable Title VII procedural framework that applies to both NFEPA and Title VII retaliation claims, a plaintiff must produce either direct evidence of retaliation or create an

inference of it under the *McDonnell Douglas* burden-shifting framework in order to defeat summary judgment. *Naguib v. Trimark Hotel Corp.*, 903 F.3d 806, 811 (8th Cir. 2018). "Direct evidence shows a specific link between the alleged animus and the termination sufficient to support a substantially strong inference that the employer acted based upon that animus." *Id.* If there is no direct evidence of retaliation, an inference is required, and the familiar *McDonnell Douglas* burden-shifting analysis applies. *Id.*

1. *Direct Evidence*

Williams argues that H&H's admission it fired her due to her Facebook post constitutes direct evidence of retaliation, thus settling the question of retaliation and obviating the need for the Court to engage in the burden-shifting analysis. Filing 97 at 27. Because the post does not fall within Title VII retaliation protections and because disputed issues of material fact exist as to whether the post constitutes direct evidence of retaliation for purposes of NFEPA, summary judgment is improper on the issue of whether direct evidence establishes retaliatory firing.

First, the Facebook post can only ostensibly be read as opposing age discrimination in H&H's hiring practices, not any other form of employment discrimination. In the post, Williams wrote, "I make $19 an hour, but the job I applied for was $50k a year. . I was too "old" for that . . . ." Filing 98-9 at 1. The remainder of the post is Williams expressing her dissatisfaction with her pay, but not in relation to any alleged employment discrimination. Williams's post nowhere references her gender or any form of gender-based discrimination and thus cannot be read as opposing any unlawful practice based on sex. As stated above, Title VII only prohibits retaliation based on opposition to an unlawful employment practice "because of [an] individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a). Thus, opposition to *age*-based

discrimination does not fall within Title VII's purview and Williams's Facebook post relating to age cannot be direct evidence of retaliation under Title VII.

Retaliation under NFEPA is broader than Title VII and encompasses opposition to "any practice or refus[al] to carry out any action unlawful under federal law or the laws of this state." Neb. Rev. Stat. § 48-1114(1) (Supp. 2019). Because age-based discrimination in hiring is unlawful under the NADEA, Neb. Rev. Stat. § 48-1004(1), opposition to it could form the basis of a retaliation claim, unlike under Title VII. Williams alleges that H&H admitted firing her due to her Facebook post. As noted, in the Facebook post, Williams claims the company discriminated against her by not considering her for the sales job she wanted because she was "too old." However, Zane's email immediately after seeing the Facebook post indicated he wanted to fire Williams due to her posting about her earnings, not due to her statement about alleged age-discrimination: "I am getting a[n] email of Sawnya [Williams] posting her Christmas bonus, a pay stub, and what she think she made in profit out of a YMS report. She posted on Face Book [sic]. She need [sic] fired!" Filing 98-14 at 3. Thus, it is disputed whether H&H admitted firing Williams due to protected activity (opposing age discrimination in the Facebook post) or whether it only admitted firing her for nonprotected activity (complaining about pay and posting information H&H believed to be confidential in the same Facebook post). Further, Plaintiff complained in her email to HR dated December 21, 2016, that she had not been considered for the sales job because she was "too old," and upon receiving Pedersen's email informing him she had made such a statement, Zane immediately inquired about firing Plaintiff, stating, "Thanks, I need to know how to get rid of her legally, she will be a problem!!" Filing 98-14 at 4. Because there is no undisputed direct evidence of retaliatory termination under either Title VII or NFEPA, the Court must turn to the burden-shifting analysis.

*2. McDonnell Douglas Analysis*

Under the *McDonnell Douglas* framework for retaliation claims, the plaintiff must establish a prima facie retaliation claim showing (1) she engaged in protected conduct, (2) she was subjected to an adverse employment action, and (3) there was a causal connection between the protected conduct and the adverse action. *Naguib*, 903 F.3d at 811 (quoting *Wood v. SatCom Mktg., LLC*, 705 F.3d 823, 828 (8th Cir. 2013)) (Title VII); *O'Brien v. Bellevue Pub. Sch.*, 289 Neb. 637, 650, 856 N.W.2d 731, 741 (2014) (NFEPA). If the plaintiff establishes a prima facie case, "the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for the action." *Naguib*, 903 F.3d at 811. If the employer does so, the burden shifts back to the plaintiff to demonstrate that the stated reason is pretextual by discrediting the stated reason and showing the circumstances permit drawing a reasonable inference that the real reason for the adverse action was retaliation. *Id.*

a. Prima Facie Case

Here, Williams can meet her prima facie burden under NFEPA but not under Title VII. Williams sent an email to H&H's HR representative complaining about not being paid overtime and H&H discriminating in their hiring practices based on her age. Filing 98-10 at 1-2. Her complaints to HR, like her Facebook post, did not contain any opposition to gender-based discriminatory practices or any of the other enumerated Title VII categories. Thus, as with her Facebook post, her email to Pedersen cannot establish protected conduct under Title VII because it does not constitute opposition to an unlawful employment practice "because of [an] individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a).

Williams's actions do, however, constitute a prima facie case of protected activity under NFEPA. Unlike Title VII, NFEPA encompasses opposition to *any* unlawful practice, not just

claims based on race, religion, gender, or nationality. *See* Neb. Rev. Stat. § 1114(1) (Supp. 2019). Williams's email and Facebook post contained complaints opposing H&H's alleged age discrimination in hiring and alleged non-payment of overtime wages. As set forth above, age-based discrimination in hiring is unlawful under the NADEA. Neb. Rev. Stat. § 48-1004(1). Likewise, nonpayment of earned overtime is unlawful under the Fair Labor Standards Act. *See* 29 U.S.C. 207(a)(1) ("[N]o employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."). Accordingly, Williams's opposition to these practices establishes the first element of her prima facie case for retaliation under NFEPA.

Williams has also established the rest of her prima facie case under NFEPA by showing she was subject to an adverse employment action (her termination) and that there was a causal connection between her complaints to HR and her termination. Nebraska courts have agreed with Eighth Circuit precedent that in certain cases "proximity between protected activity and an adverse employment action can be sufficient to circumstantially demonstrate causality" at the prima facie stage. *Helvering v. Union Pac. R. Co.*, 13 Neb. App. 818, 836, 703 N.W.2d 134, 151 (2005) (citing *Smith v. Allen Health Systems, Inc.*, 302 F.3d 827 (8th Cir. 2002)). For example, in *Helvering*, the Nebraska Court of Appeals found that a proximity of three weeks between an employee's protected conduct and the adverse employment action was sufficient to demonstrate prima facie causality. *Id.* at 837, 703 N.W.2d at 151.

Here, Williams's complaints to HR occurred in a series of emails starting on December 21, 2016, and she was terminated on January 9, 2017, a timespan of two and a half weeks. Filing 98-10 at 1; Filing 92-1 at 10. Furthermore, Zane's emails with HR indicate he became upset and began

making plans to terminate Williams immediately upon hearing of her complaints, and Zane testified he would have fired her on January 7th rather than waiting until the 9th but Williams was not at work. Filing 92-1 at 10. Accordingly, this temporal proximity is sufficient for Williams to establish a prima facie case of retaliation under NFEPA and to shift the burden to H&H to articulate a nondiscriminatory reason for her firing.

b. Legitimate, Non-Retaliatory Reason

Because Williams has established a prima facie case of retaliation under NFEPA, the burden shifts to H&H to articulate a legitimate, non-retaliatory reason for her termination. *Helvering*, 13 Neb. App. at 838, 703 N.W.2d at 152. H&H has pointed to Williams's poor performance as commodities broker, her disruptive behavior in the workplace, and by posting what it perceived to be confidential information on Facebook regarding earnings in violation of her NDA. This is adequate to establish a legitimate reason for Williams's firing and shift the burden back to Williams to demonstrate the firing was, in fact, pretextual.

c. Pretext

Because H&H has demonstrated a legitimate, nondiscriminatory reason for terminating Williams it becomes her burden to prove the proffered reason is merely a pretext for retaliation. *Naguib*, 903 F.3d at 811.

"It is . . . incumbent upon an employee [alleging retaliation] to prove not only falsity of the proffered reasons given by the employer, but also that discriminatory motive was the true reason for the discharge." *Rose v. Vickers Petroleum*, 4 Neb. App. 585, 590, 546 N.W.2d 827, 832 (1996) (citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S. Ct. 2742, 125 L.Ed.2d 407 (1993)); *see also Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362, 133 S. Ct. 2517, 2534, 186 L. Ed. 2d 503 (2013).

Williams has demonstrated that in addition to the circumspect timing of her termination almost immediately after making complaints to HR, Zane also sent an email to Pedersen asking "how to get rid of her legally." Filing 98-14 at 4. Zane and Pedersen also engaged in a lengthy discussion on how to set the stage to fire Williams without it raising suspicions or leading to a lawsuit. Filing 98-14 at 1-2. Further, Williams testified that Zane told her she was being terminated for "telling the H.R. guy 'nothing but lies,'" presumably a reference to her email complaints to Pedersen. Filing 92-31 at 161; Filing 98-1 at 7. This evidence creates a genuine dispute of material fact as to whether H&H's true reason for firing Williams was in retaliation for her complaints to HR about its denial of overtime pay and discriminatory hiring practices based on age.[7] Indeed, a finder of fact could conclude based upon the evidence presented on summary judgment that Zane intended to fire Plaintiff without regard to the Facebook post, because that is exactly what Zane and Petersen discussed doing before Zane apparently even knew about the Facebook post. Accordingly, summary judgment in H&H's favor is not appropriate on Williams's NFEPA retaliation claim.

### E.  COBRA

In Count VIII of her Complaint, Williams seeks damages based on H&H's failure to provide her with timely notice of her right to extend coverage under its group health plan. Filing 1 at 9. H&H argues Williams was not entitled to COBRA benefits because she was terminated due

---

[7] It is true that in her December 21, 2016 e-mail and in her Facebook post, Williams complained about discriminatory hiring practices. However, in this lawsuit, Williams does not make a claim for discriminatory hiring practices. A claim for retaliation under NFEPA can be made for "any practice or refus[al] to carry out any action unlawful under federal law or the laws of this state." Neb. Rev. Stat. § 48-1114(1) (Supp. 2019). As noted previously, because age-based discrimination in hiring is unlawful under the NADEA, Neb. Rev. Stat. § 48-1004(1), opposition to it could form the basis of a retaliation claim. Under the plain language of NFEPA, Plaintiff may properly allege she was improperly fired due to retaliation for complaining about age-based discrimination in hiring even though such a claim is not a part of the instant lawsuit. *See, e.g.*, *Rose*, 4 Neb. App. at 592, 546 N.W.2d at 833 ("[T]he law does not permit an employee's well-founded, albeit unsuccessful, complaint of . . . discrimination to be used by an employer as an excuse to retaliate by firing the employee.").

to "gross misconduct" for breaching her NDA. Filing 91 at 40. Alternatively, H&H argues Williams is not entitled to damages because it acted in good faith and she did not incur any medical expenses due to H&H's delay in sending COBRA notice. Filing 91 at 43-44. The Court agrees damages are not warranted.

"In the Consolidated Omnibus Budget Reconciliation Act of 1986 ('COBRA'), Congress amended the Employee Retirement Income Security Act ('ERISA') to require that covered group health plans 'provide . . . that each qualified beneficiary who would lose coverage . . . as a result of a qualifying event is entitled . . . to elect . . . continuation coverage under the plan.'" *Chesnut v. Montgomery*, 307 F.3d 698, 700 (8th Cir. 2002) (quoting 29 U.S.C. § 1161(a)). Termination of employment is a "qualifying event" for purposes of this COBRA requirement. *Id.* (citing 29 U.S.C. § 1163(2)).

"Under 29 U.S.C. § 1132(c)(1)(A), an ERISA plan administrator may in the court's discretion be personally liable up to $100 per day from the date of his or her failure to comply with the notification requirements of 29 U.S.C. § 1166(a)(4)." *Starr v. Metro Sys., Inc.*, 461 F.3d 1036, 1040 (8th Cir. 2006) (internal quotation marks omitted). "The purpose of this statutory penalty is to provide plan administrators with an incentive to comply with the requirements of ERISA . . . and to punish noncompliance. *Id.* (citing *Chesnut*, 307 F.3d at 704; *Kerr v. Charles F. Vatterott & Co.*, 184 F.3d 938, 948 (8th Cir. 1999)). "In exercising its discretion to impose statutory damages, a court primarily should consider 'the prejudice to the plaintiff and the nature of the plan administrator's conduct.'" *Id.* (quoting *Kerr*, 184 F.3d at 948). "Although relevant, a defendant's good faith and the absence of harm do not preclude the imposition of the § 1132(c)(1)(A) penalty." *Id.* (quoting *Chesnut*, 307 F.3d at 703).

H&H does not dispute it failed to comply with the COBRA notice requirements. Filing 91 at 42. However, Joscelyn testified that she was the plan's administrator and was not aware that H&H was subject to COBRA because the company's insurance agent had said it was not. Filing 92-7 at 6. After receiving the Department of Labor notice, Joscelyn determined H&H was, in fact, subject to COBRA. Filing 92-7 at 5-6. H&H promptly sent Williams a letter regarding her right to continue her health care coverage pursuant to COBRA. Filing 98-17 at 3. Furthermore, Williams testified that she did not incur any medical expenses while she was uninsured, and she secured health insurance at her new job starting in April 2017. Filing 92-31 at 143, 146-47. Williams was also able to obtain free counseling sessions for mental-health issues during the time she did not have health insurance. Filing 92-31 at 57, 143-44, 146. There is no other evidence of damages or harm that Williams suffered due to the delayed COBRA notice.

Based on this evidence, the Court concludes that H&H acted in good faith and Williams suffered no harm due to its failure to provide her with timely notice under COBRA. Accordingly, the Court exercises its discretion in determining Williams it not entitled to damages. There is therefore no need to address H&H's argument that Williams committed gross misconduct.

### F. Breach of Nondisclosure Agreement

In Count I of its counterclaim, H&H alleges Williams breached her NDA "by posting confidential profitability information to Facebook." Filing 6 at 12. The Court concludes Williams is entitled to summary judgment on this claim because H&H has not demonstrated that it suffered any damages as a result of her alleged breach.

"In order to recover in an action for breach of contract, the plaintiff must plead and prove the existence of a promise, its breach, damage, and compliance with any conditions precedent that activate the defendant's duty." *Phipps v. Skyview Farms, Inc.*, 259 Neb. 492, 498, 610 N.W.2d

723, 730 (2000) (quoting *Solar Motors v. First Nat. Bank of Chadron*, 249 Neb. 758, 545 N.W.2d 714 (1996)).

H&H introduced no documentary evidence demonstrating that it suffered any damages as a result of Williams's Facebook post. Furthermore, Zane testified that the company incurred no damages due to Williams's supposed breach of the NDA:

> Q [Plaintiff's attorney]: So number 3 is kind of the same. I'm looking for damages and harms, but this time I'd like to know what damages or harms resulted from her allegedly breaching her [nondisclosure] contract with you?
>
> A [Zane Malcom]: None.

Filing 95-3 at 2.

Because there is no dispute that H&H cannot meet an essential element for its breach of contract claim (damages), summary judgment in Williams's favor is warranted.

### G. Defamation

In Count II of its counterclaim, H&H alleges Williams's Facebook post constituted defamation. Filing 6 at 12-13. The Court concludes Williams is entitled to summary judgment on this claim because H&H did not timely file its counterclaim for defamation and because it has not demonstrated it suffered damages.

An action for libel or slander must be commenced within one year. Neb. Rev. Stat. § 25-208 (Reissue 2016). "Nebraska law expressly holds that for purposes of the statute of limitations, a counterclaim, as an action, is considered commenced on the date the plaintiff's complaint is filed." *Broom, Clarkson, Lanphier & Yamamoto v. Kountze*, No. 8:14CV206, 2015 WL 3875083, at *1 (D. Neb. June 23, 2015) (citing *Becker v. Hobbs*, 590 N.W.2d 360 (Neb.1999)), *affirmed by* No. 8:14CV206, 2015 WL 7576016 (D. Neb. Nov. 25, 2015).

Here, H&H's counterclaim was based on Williams's Facebook post dated December 10, 2016, and which it learned about on January 5, 2017. Filing 98-14 at 3. Its defamation action is deemed commenced on the date Williams filed her complaint, March 27, 2018. By any measure, this is well beyond the one-year statute of limitations provided for in Neb. Rev. Stat. § 25-208.

Furthermore, even if H&H's defamation claim were not barred by the statute of limitations, it would necessarily fail for not alleging either correction or special damages. "A claim of defamation requires (1) a false and defaming statement concerning the plaintiff, (2) an unprivileged publication to a third party, (3) fault amounting to at least negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." *Brooks v. Pauli*, No. A-17-716, 2018 WL 3045502, at *2 (Neb. Ct. App. June 19, 2018) (citing *Norris v. Hathaway*, 5 Neb. App. 544, 561 N.W.2d 583 (1997)). "In an action for damages for the publication of a libel . . . , the plaintiff shall recover no more than special damages unless correction was requested as herein provided and was not published." Neb. Rev. Stat. § 25-840.01 (Reissue 2016). "The term special damages, as used in this section, shall include only such damages as plaintiff alleges and proves were suffered in respect to his or her property, business, trade, profession, or occupation as the direct and proximate result of the defendant's publication." *Id.*

H&H has presented no evidence that it requested Williams correct her alleged defamatory Facebook post. Furthermore, H&H has not pled special damages and when Zane was asked, "[W]ith respect to the Facebook post, what damages or harms has your company suffered as a result of that post?" he responded, "None." Filing 95-3 at 2. Accordingly, summary judgment in Williams's favor is appropriate on H&H's counterclaim for defamation.

## H. Attorney Fees

Both parties seek attorney fees. Filing 1 at 10; Filing 91 at 46-48. Because the Court is not fully disposing of this matter, it finds it appropriate to reserve any determination regarding attorney fees until final judgment is entered. The parties may re-assert their motions regarding attorney fees at such time.

### I. Motion to Strike and/or Leave to Surreply

Lastly, following H&H's Reply Brief, Williams filed a Motion to Strike and/or Leave to Surreply. Filing 103. Williams asks the Court to strike or allow her to respond to two portions of H&H's brief relating to retaliation which she contends were improperly raised in its reply brief. Filing 104 at 1. First, Williams points to H&H's discussion in its brief that it believes it could have fired her for violating her NDA "[r]egardless of whether H&H considered any improper reasons." Filing 1-4 at 3. Williams characterizes this as H&H's attempt to improperly assert an after-acquired evidence affirmative defense. Filing 104 at 4. Second, Williams points to a footnote in which H&H states it does not think the Facebook post is protected conduct, and the only scheme "that even comes close" to covering the post as protected activity is the National Labor Relations Act (NLRA) which was not raised in this case. Filing 101 at 7 n.1. Williams argues this is beyond the scope of the prior briefing since neither party previously mentioned the NLRA or "concerted activity." Filing 104 at 6.

As analyzed above, Williams prevailed on H&H's summary judgment motion as it relates to her NFEPA retaliation claim and thus to the extent her objections relate to that cause of action, they are no longer relevant. Furthermore, the reason for denying summary judgment on Plaintiff's federal retaliation claim was because her comments related to alleged age discrimination are not protected conduct under Title VII, not because the Court found H&H could have fired Williams

anyway or because it determined her actions fell under the NLRA. Accordingly, Williams's request to strike or surreply is moot and is denied as such.

## V.    CONCLUSION

For the foregoing reasons, H&H's Motion for Summary Judgment is granted as to Williams's Equal Pay Act claim and gender-based wage-discrimination claim, her federal and state gender-discrimination claims, her federal and state age-discrimination claims, her federal retaliation claim, and her COBRA violation claim. H&H's Motion for Summary Judgment is denied as to Williams's NFEPA retaliation claim.[8] Williams's Motion for Summary Judgment is granted in full as to H&H's breach-of-contract and defamation claims. Lastly, Williams's Motion to Strike and/or Leave to Surreply is denied as moot.

IT IS ORDERED:

1. Defendant, H&H Auto Parts, LLC's, Motion for Summary Judgment (Filing 90) is granted as to Plaintiff's state and federal gender discrimination claims found at Counts I and II of her Complaint, granted as to Plaintiff's state and federal age discrimination claims found at Counts III and IV of her Complaint, granted as to Plaintiff's federal retaliation claim found at Count V of her Complaint, granted as to Plaintiff's allegation of violation of the Equal Pay Act found at Count VII of her Complaint, and granted as to Plaintiff's allegation of violation of COBRA found at Count VIII of her Complaint;

---

[8] After disposition of the Motions for Summary Judgment, only Williams's state-law retaliation claim remains. A district court may decline supplemental jurisdiction if it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "It is within the district court's discretion to exercise supplemental jurisdiction after dismissal of the federal claim." *Glorvigen v. Cirrus Design Corp.*, 581 F.3d 737, 749 (8th Cir. 2009) (quoting *Quinn v. Ocwen Fed. Bank FSB*, 470 F.3d 1240, 1249 (8th Cir. 2006)). In deciding whether to exercise supplemental jurisdiction, a court considers "factors such as judicial economy, convenience, fairness and comity." *Id.* (quoting Quinn, 470 F.3d at 1249). Here, the Court has expended significant time familiarizing itself with the facts of this case and, considering the required factors, decides to exercise jurisdiction over Williams's remaining state-law claim.

2. Defendant, H&H Auto Parts, LLC's, Motion for Summary Judgment ([Filing 90](#)) is denied as to Plaintiff's NFEPA retaliation claim, Count VI of her Complaint;

3. Plaintiff, Sawyna Williams's, Motion for Summary Judgment ([Filing 93](#)) is granted in full as to Defendant's counterclaims for breach of contract and defamation; and

4. Plaintiff's Motion to Strike and/or Leave to Surreply ([Filing 103](#)) is denied.


Dated this 30th day of January, 2020.


BY THE COURT:

_____
Brian C. Buescher
United States District Judge